LEON GREENBERG, ESQ., SBN 8094
RUTHANN DEVEREAUX-GONZALEZ, ESQ., SBN 15904
Leon Greenberg Professional Corporation
1811 South Rainbow Blvd- Suite 210
Las Vegas, Nevada 89146
(702) 383-6085
(702) 385-1827(fax)
leongreenberg@overtimelaw.com
ranni@overtimelaw.com

LAW OFFICES OF GABRIEL DEL VIRGINIA
30 Wall Street, 12th Floor
New York, New York 10005
Telephone: 212-371-5478
Facsimile: 212-371-0460
*gabriel.delvirginia@verizon.net*
Admitted *Pro Hac Vice*

Attorneys for Creditor
Leon Greenberg Professional Corporation
Attorneys for *Murray* Case Creditors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

-------------------------------------------------------X

**In re:**

                                                         **Case No. BK-22-14361-nmc**

**A CAB, SERIES L.L.C.**
    **fka A CAB, LLC,**                          **Chapter 11**

                 **Debtor.**         Hearing Date: September 25 & 26, 2024
                                         Hearing Time: 9:30 am

-------------------------------------------------------X

## OBJECTIONS OF THE *MURRAY* CASE CREDITORS AND LEON GREENBERG PROFESSIONAL CORPORATION TO DEBTOR'S AMENDED PLAN OF REORGANIZATION [ECF 504] FILED JUNE 3, 2024

# TABLE OF CONTENTS

*Page*

RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OBJECTIONS

I.  The Plan improperly includes in the Debtor's Estate $303,695 of appeal bond funds that are not the Debtor's property; those funds are property of the *Murray* Creditors who have been denied access to those funds since December 14, 2022, when the state court case was improperly removed to this Court. . . . . . . . . . . . . . . . . 4

II. The Plan, by understating the Debtor's liquidation value by over $2,000,000, falsely asserts the Debtor is insolvent; the Debtor is solvent and the Plan improperly fails to pay creditors "solvent debtor" post-petition interest at the Nevada judgment rate. . . . . . . . . . . . . . . . 5

   A.  The Debtor's taxicab medallions have a liquidation value reasonably presumed to be in excess of $█████ . . . . . . . . . . 6

      1.  The Court previously found the Debtor's Taxicab Medallions had a material value for liquidation purposes; it also found prior sales of Las Vegas Taxicab Medallions placed such a value in excess of the value of the vehicles sold with the medallions. . . . . . . . . . . 7

      2.  Comparable sales confirm each of the Debtor's 142 or 145 taxi medallions have a value of at least █████ and likely in excess of █,███. . . . . . . . . . . . . . . . . . 8

      3.  The 2019 taxi medallion sales provide comparable values and likely understate current medallion values. . . . . . . . . 9

      4.  Nady confirmed the Debtor's taxicab medallions had a value of approximately $2,000,000 by warranting that the Debtor had a value of $4,500,000 just before filing the Debtor's Petition.. . . . . . . . . . . . . . . . . . 11

      5.  The Debtor was offered $14,000,000 for its Medallions in 2010; even if they have decreased in value by 90% they are still worth $1,400,000.. . . . . . . . . . . . 12

   B.  The Debtor's avoidance actions, including the one involving the 800 North Bruce Street, real estate, have a reasonably presumed value that are in excess of $1,000,000. . . . . . . . . . . . . . . . . . . 13

      1.  The Court previously found the Debtor's avoidance action claims were valuable and of concern, rendering unworthy of acceptance the Debtor's assertion those claims should be given no value for liquidation purposes.. . . . . . 13

*Page*

2.   The avoidance action involving the 800 North Bruce
property alone is properly valued at over $1,000,000 . . . . . . . . . . 14

3.   The avoidance actions can be pursued at no
risk to the Debtor's Estate by the *Murray* Creditors . . . . . . . . . 15

C.   The Plan's liquidation analysis omits two other known assets
of the Debtor having a liquidation value of over $250,000; it
may understate its current cash holdings by over $470,000;
and it provides no accounts receivable amount despite otherwise
reporting that amount as being in excess of $540,000. . . . . . . . . . . . . . . 15

D.   No "equitable considerations" exist allowing
the Debtor to not pay creditors post-petition
interest at the Nevada judgment interest rate. . . . . . . . . . . . . . . . 17

III.   The Plan has the Debtor paying at least $995,000 in
income taxes it can legally avoid and does not need to pay.. . . . . . . . . . . 18

A.   The Debtor has no income tax liability; it cannot
adopt a Plan paying its owner's income tax liabilities. . . . . . . . . . . 18

B.   The Plan improperly diverts $995,000 or more to
pay taxes the Debtor does not owe and for Nady's sole
benefit; those monies should be promptly paid to creditors. . . . . . . . . . 22

1.   If the Debtor retains its disregarded entity status the
Plan is paying $1,895,827 in income taxes not owed. . . . . . . . . . 22

2.   If the Debtor ends its disregarded entity status the Plan
is paying at least $995,000 in income taxes not owed.. . . . . . . . . 23

IV.   The Plan imposes an improper "Disputed Claims Reserve" on
the Murray Creditors to continue to delay their Plan payments;
that is neither fair nor equitable and the Debtor and Nady
cannot be allowed to subvert state law, and the state court
appeal bond process, in such a fashion.. . . . . . . . . . . . . . . . . . . . 27

V.   The Plan fails to properly safeguard the rights of creditors.. . . . . . . . . . 30

A.   The Plan does not unequivocally make all of the Debtor's
assets, including those nominally titled to its "subseries"
LLCs, available to satisfy the Plan's obligations. . . . . . . . . . . . . . 30

B.   The Plan should unambiguously provide that the Murray
Creditors alter ego claims against Nady are not an Estate Asset. . . . . . . 32

C.   The Plan should include a guarantee from Nady,
personally, to not transfer the 800 North Bruce Property;
require consent or approval for any such transfer; and
only stay, not dismiss, the pending fraudulent conveyance case. . . . . . . 33

*Page*

VI.    The Plan should provide for the state court to oversee the distribution of Plan payments to the 661 *Murray* Class members. . . . . . . . . . . 34

VII.   The Plan improperly delays payments to creditors by allowing over $1,000,000 of unnecessary and highly unlikely expenses. . . . . . . . . . . . 35

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Michael Murray and 660 additional creditors, represented by Leon Greenberg Professional Corporation, and creditor Leon Greenberg Professional Corporation, ("*Murray* Creditors" or "Objectors") set forth their Objections to the Debtor's Plan of Reorganization (the "Plan").

## RELEVANT BACKGROUND

On March 5, 2024, the Court made findings denying confirmation of the Debtor's previously proposed Chapter 11, Subchapter V, Plan.   Debtor's Exhibit ("DE") 123.  In response the Debtor submitted an amended Plan on June 3, 2024, DE 125, ECF 504, to which the *Murray* Creditors now Object.   The *Murray* Creditors hold class action judgments in excess of $1,500,000, and additional unliquidated claims as a result of the Debtor's failure to pay minimum wages.  They hold over 96% of all general unsecured claims[1] and are the only creditors with any significant interest in the Plan.

## SUMMARY OF OBJECTIONS

The *Murray* Creditors Object to the Plan for the following reasons:

1.     The Plan improperly claims the Debtor is insolvent.   The Plan's liquidation analysis fails to include assets having a liquidation value of well over $2,000,000.  By doing so it wrongly claims the Debtor is insolvent and denies the *Murray* Creditors post-petition interest on their claims as solvent debtor creditors. *See, In re PG&E Corp.*, 46

---

[1]   The *Murray* Creditors have filed proofs of claim for liquidated and unliquidated amounts totaling $2,424,507.  The Plan asserts besides the *Murray* Creditors there are only $90,000 of additional general unsecured creditor claims. DE 125, ECF 504, p. 6.

F.4th 1047, 1064 (9th Cir. 2022) (Under "solvent-debtor exception" creditors of solvent debtor have equitable right to post-petition interest as provided for by state law).

2.      The Plan has the Debtor paying taxes it does not owe.  The Plan will pay at least $995,000 or more in taxes that the Debtor does not owe.  Those proposed tax payments would benefit the Debtor's principal, Nady, will improperly delay payments to the *Murray* Creditors, and threaten the certainty of such payments.

3.      The Plan gives $303,620 of the *Murray* Creditors property to the Debtor. The Plan improperly includes $303,620 as an asset of the Debtor and subject to the Plan. Those funds are an appeal bond and property of the *Murray* Creditors who must be allowed to use them, when released by the state court, towards satisfaction of their claims.  The *Murray* Creditors have been awaiting a decision on their fully argued motion to remand their removed state court action, so those funds can be so released by the state court, since March 23, 2023.

4.      The Plan imposes an improper disputed claims reserve.  The Plan improperly delays payments due under the Plan to the *Murray* Creditors while the Debtor pursues interminable appeal and post-judgment proceedings in the Nevada State Court.  Whether such a stay of Plan payments to the *Murray* Creditors, as state court judgment holders, should be imposed involves issues of state law that should be decided by that court upon remand of the removed state court action.

5.      The Plan fails to properly safeguard the rights of creditors.  The Plan fails to properly protect the rights of the *Murray* Creditors by failing to: (a) properly make the Debtor's "sub series" LLCs and their assets available to fund the Plan's obligation to

pay all creditors in full; (b) properly acknowledge the *Murray* Creditors' claim against Creighton J. Nady, as a separately liable alter-ego of the Debtor, is not an asset of the Debtor's Estate and may proceed to prosecution upon remand of the removed state court case; and (c) properly preserve the status of the pre-petition fraudulent conveyance action and certain real estate against which the Debtor has a fraudulent conveyance claim of over $1,000,000.

6. <u>The Plan fails to properly administer payments.</u>    There are 661 *Murray* Creditor class members. The mechanics and costs of distributing Plan payments to them should be returned to the state court for its directions upon remand of the removed case.

7. <u>The Plan provides for over $1,000,000 of unnecessary expenses.</u>    The Plan delays payments to creditors by including over $1,000,000 of projected expenses that are neither necessary nor reasonably likely to be incurred by the Debtor.

**The *Murray* Creditors do not object to a Plan promptly paying<br>their claims in full with interest over a potential five-year Plan period.**

The *Murray* Creditors are agreeable to a Plan paying their claims in full, with post-petition interest as provided for by Nevada law, over up to five years. They would not oppose a Plan (1) Properly securing the Debtor's assets to ensure they would be so paid; (2) Remanding the improperly removed adversary case No. 22-1163, recognizing the $303,624 of appeal bond funds and alter-ego claims in that case are not property of the bankruptcy estate; (3) Not delaying Plan payments to the *Murray* Creditors while the Debtor pursues in state court a second and any further appeals of the *Murray* judgment (the Debtor could seek a stay of such payments in the state court like any other

appellant); (4) Not delaying Plan payments to the *Murray* Creditors by having the Debtor pay taxes it does not owe and by allowing for other unnecessary expenses; and (5) Having the Plan payments to the 661 *Murray* Creditor class members subject to administration by the state court and allowing that court to require the Debtor to assume the costs of such administration.

## OBJECTIONS

I.     **The Plan improperly includes in the Debtor's Estate $303,695 of appeal bond funds that are not the Debtor's property; those funds are property of the *Murray* Creditors who have been denied access to those funds since December 14, 2022, when the state court case was improperly removed to this Court.**

The Plan asserts $303,695 in *Murray* appeal bond funds are property of the Debtor's Estate and subject to administration under the Plan. They are not. *See, In Re Dupitronics Inc.*, 183 B.R. 1010,1014 (Bankr N.D. Ill. 1995) and *In re Keene Corp.* 162 B.R. 935, 941-42 (Bankr. S.D.N.Y. 1994) (appeal bond funds are not bankruptcy estate property). They are property of the *Murray* Creditors. They are held in the IOLTA account of their counsel until such further order issues in the state court case regarding their distribution to the over 660 *Murray* Creditors. When those funds are distributed to the *Murray* Creditors, their claims against the Debtor shall be reduced commensurately. But the distribution and handling of those funds is otherwise of no concern to the Debtor, is not properly part of the Plan, and should not involve this Court.

The Debtor improperly removed the state court case 21 months ago, on December 14, 2022, solely to obstruct the potential distribution of the appeal bond funds to the *Murray* Creditors. The status of those funds, and the impropriety of having this Court,

or the Debtor's Plan, involved with the administration of those funds, is fully discussed in the motion to remand [Doc 9 Adv. No. 22-01163] *sub judice* with the Court for over 17 months, since March 23, 2023.   The motion to remand should be granted most promptly and all provisions of the Plan concerning the handling of such funds (except for acknowledging payments of such funds will reduce *Murray* Creditor claims) should be stricken from the Plan.

**II.     The Plan, by understating the Debtor's liquidation value by over ███████ falsely asserts the Debtor is insolvent; the Debtor is solvent and the Plan improperly fails to pay creditors "solvent debtor" post-petition interest at the Nevada judgment rate.**

The Court, in rejecting the Debtor's prior proposed Plan, found the Debtor's taxicab medallions and its avoidance actions (including those involving the 800 North Bruce property), given no liquidation value in that prior Plan, *had* significant value.  DE 123, p. 8-13, ACAB 3148-3153.   It expressly found that the Debtor was unable to provide any "credible explanation" why the Court should find otherwise.  *Id.*, p. 12, l. 20-23, ACAB 3152.  It further observed that, in respect to the avoidance actions reviewed in the Subchapter V trustee's reports, "that only a fraction of these potentially avoidable payments will easily exceed the amount necessary to pay all claims" of creditors.  *Id.*

The Debtor's revised Plan ignores the Court's foregoing findings. Its liquidation analysis *still gives no value* to the Debtor's two biggest assets, stating the value of its Taxicab Medallions and Avoidance Actions are "unknown."  In doing so the Plan asserts a Chapter 7 liquidation would provide $1,684,897 for payment of *Murray*

Creditor general unsecured claims currently asserted to be $2,424,507 (consisting of liquidated – state court judgment – claims of $1,634,583 and unliquidated claims of at least $789,924).

Contrary to the Plan's liquidation analysis, the Debtor is solvent and a Chapter 7 liquidation would pay all creditors in full. Its failure to provide for the payment of post-petition interest to the *Murray* Creditors, at the applicable Nevada judgment interest rate, is improper. *See, In Re PG&E Corp.,* 46 F.4th at 1064, holding creditors of solvent debtors have an "equitable right to receive postpetition interest under the solvent-debtor exception." While the *Murray* Creditors' right to such postpetition interest is equitable, they are presumed to be entitled to such interest at the Nevada interest rate that attached to their judgments, absent "compelling equitable considerations." *Id.* No such compelling equitable considerations exist and the Plan cannot be confirmed unless it provides for payment of the *Murray* Creditors' claims with post-petition interest at the Nevada judgment interest rate.

### A. The Debtor's taxicab medallions have a liquidation value reasonably presumed to be in excess of ▓▓▓▓▓

The Debtor's claim its taxi medallions have no liquidation value because they can only be transferred to a buyer approved by the Nevada Taxicab Authority ("NTA") is incorrect. Such a privileged license is property of a Debtor's estate and has value despite its limited transferability. *See, In re Circle 10 Restaurant, LLC*, 519 B.R. 95, 127-28 (Bank D. NJ 2014) (debtor's liquor license, transferable with approval of liquor board, is bankruptcy estate asset with value) *citing 21 West Lancaster Corp. v. Main*

*Line Restaurant, Inc.*,790 F.2d 354, 357 (3rd Cir. 1986) (debtor's liquor license has value to bankruptcy estate despite holder's inability to freely transfer it when state agency can and does approve such transfers) and numerous cases.

The record abundantly supports a finding that the liquidation value of the Debtor's taxicab medallions is in excess of ██████████ and very likely significantly greater than that amount.

**1.      The Court previously found the Debtor's Taxicab Medallions had a material value for liquidation purposes; it also found prior sales of Las Vegas Taxicab Medallions placed such a value in <u>excess of the value of the vehicles sold with the medallions.</u>**

Based on the testimony and other evidence presented in connection with the Debtor's prior Plan, the Court found the Debtor's taxi medallions "clearly have some value" for liquidation analysis purposes. DE 123, p. 8, l. 24 – p. 9, l. 5. ACAB 3148-49. While it made no precise finding as to their exact value, it observed information presented about prior sales of Las Vegas taxicab medallions placed a value on those medallions that "exceeded the value of the vehicle being sold to the buyer." *Id.*, p. 9, l. 7-11, ACAB 3149. If that finding is understood to mean the liquidation value of the Debtor's taxicab medallions should be presumed to exceed the value of the Debtor's taxicabs, it would mean such medallions would have a value in excess of $800,000 (the amount stated for its taxicabs in its current liquidation analysis).

**2.    Comparable sales confirm each of the Debtor's 142 or 145[2] taxi medallions have a value of at least ▬▬▬ and likely in excess of ▬▬▬**

In 2019 Frias Transportation conducted two sales of its Las Vegas taxicab medallions.   One was for 132 taxicab medallions for ▬▬▬ each) (the Blue Desert purchase) and the other was for 928 taxicab medallions for ▬▬▬ each) (the YCS purchase).   Ex.[3] H, I (S-1, S-2 sealed exhibits), Bates 1566-1624, 1617-1618, 1601, 1608.    The Blue Desert transaction provides a more reliable comparison for valuing the Debtor's medallions than the YCS transaction.   Blue Desert purchased a number of medallions (132) similar to the number possessed by the Debtor (142) and could not negotiate the discount secured by YCS for its much larger purchase of 928 medallions.

Frias received a *lower* price for its taxi medallions than market forces otherwise dictated.  John Mowbray, its director, testified Frias had to sell its medallions quickly because of an imminent tax penalty if that sale was delayed.   Ex. H (S-1 sealed exhibit). Bates 1523-24, Depo. p. 11-12.   Those two transactions resulted in a sale of all its non-real estate assets for ▬▬▬ but it had received a proposal to sell those same assets in a single transaction to another buyer for ▬▬▬.  Ex. H (S-1 sealed exhibit),

---

[2]  The Debtor's schedule filed on 1/2/23 indicates possession of 142 medallions but the website maintained by the Nevada Taxicab Authority on September 4, 2024, taxi.nv.gov /uploadedFiles/taxinvgov/content/About_Us/ALL/Statistics/2024_Monthly_Statistics/Ju ly stats.pdf, indicates as of July 2024 it was assigned 145 medallions.

[3]  Ex. references are to *Murray* Creditor confirmation hearing Exhibits that will be furnished to the Court separately as per the Doc. 522 Order.

Bates 1560.   It did not pursue that potential sale because it was "unlikely" to be consummated within the time frame desired by Frias.  *Id.*  Frias also received inquiries from at least two out-of-state potential purchasers who were not already licensed to operate a Las Vegas taxicab business.  *Id.* Bates 1531-32, Depo. p. 19-20.   Frias did not pursue any possible sale to those out-of-state buyers because it could not be completed within the time frame required by Frias.  *Id.*

### 3. The 2019 taxi medallion sales provide comparable values and likely understate current medallion values.

Only holders of a Certificate of Public Convenience and Necessity ("CPCN") may possess the taxicab medallions needed to operate a Las Vegas taxicab business. NRS 706.8827.   An applicant for a CPCN seeking new taxicab medallions must establish (1) it is "fit, willing and able" to operate a taxicab business; and (2) its operations will benefit the public, not adversely impact existing operators, and service needs that would not be met by existing operators, *e.g.,* there is a *need* to issue a new CPCN with new taxicab medallions. *Id.*

Many "fit" potential CPCN applicants may be unable to establish a need to issue new taxicab medallions.  It is easier for a would-be Las Vegas taxicab operator to enter the industry by acquiring an existing operator with an established need for its taxicab medallions, as with the Frias medallion sales.  Those 2019 sales remain a valid (if too low) benchmark for determining the value of the Debtor's taxicab medallions because:

(1) The Debtor's taxicab operations' revenue increased from 7,279,156 in 2019 to $8,852,941 in 2023, with net income from those operations increasing

from $461,770 to $1,722,967.  DE 26, 85.

(2)   The Las Vegas taxicab industry is no longer in the sharp decline existing in 2019 when $254,514,916 in total employee driven and leased taxi passenger fares were collected, a decrease of 10.31% from 2018's total collections of $283,756,586.  The industry has completely reversed that decline, increasing its collection to $276,802,661 in such fares in 2023. Those fare revenues through July 2024 (the most recent information available) show a continuation of such industrywide increase in fare revenue, besting the seven-month July 2023 total by 6.63% (increasing from $165,764,457 to $155,451,540).[4]

(3)   The Las Vegas taxicab industry in 2023 received a 7% increase in taxicab fares, the first increase in those fares since 2015.[5]

(4)   There are buyers for the Debtor's taxicab medallions.  In addition to the two successful buyers of the Frias medallions in 2019 there were at least five other identified interested potential buyers, some of whom made per medallion offers comparable to or in excess of the amounts paid by the two successful purchasers.  Ex. H (S-1 sealed exhibit) Bates 1531-32, 1560.  In 2022 an application was made to the NTA to issue a CPCN and 35

---

[4] This information is published under the "statistics" webpage of the Nevada Taxicab Authority at its website.

[5] This is reported in the Las Vegas Review Journal on June 7, 2023, and confirmed at the Nevada Taxicab Authority's website and at the Debtor's deposition.

medallions to a potential new operator, further evidence there would be market interest for the Debtor's medallions if they were offered for sale.[6]

**4.      Nady confirmed the Debtor's taxicab medallions had a value of approximately $2,000,000 by warranting that the Debtor had a value of $4,500,000 just before filing the Debtor's Petition.**

Less than one month before A Cab filed its Petition, Nady applied for an appeal bond. Ex. Q (S-10 sealed) Bates 1699-1700.   Nady "warrant[ed]" all of the information he was providing in that application was "true, accurate and complete" and that application warns any person who in connection with it makes "...a false or deceptive statement is guilty of insurance fraud." *Id.* Bates 1699.  As part of that application Nady included a list of "Other Assets" he owned which gave a value of $4,500,000 to the Debtor. *Id.* Bates 1700.   He testified at his deposition that the application contained true and correct information:

> Q.      When you sought to obtain an appeal bond in 2022 that we were discussing before filing for bankruptcy, did you sign any applications in connection with those requests for an appeal bond?
> A.      Yes.
>
> Q.      Was the information you gave in those applications true and correct?
> A.      Of course.
>
> Q.      Did you understand that by signing that application, you were certifying the information was true and correct?
> A.      I assume that.   Ex. D, Bates 854-855, Deposition p. 158-59

---

[6] *See,* Las Vegas Review Journal, September 28, 2022, p. 10C, notice of public hearing on such application.

Nady was then presented with his bond application reciting the Debtor had a value of $4,500,000.   He then denied the accuracy of the representations in that application he had just stated "of course" were "true and correct." Ex. D, Bates 855-856, Depo. p. 159-160.

The Court should ignore Nady's incredulous, and untruthful, post-petition disavowal of his claim there was "equity" in the Debtor of $4,500,000 in November of 2022.   It should further presume that "equity" value claim of Nady establishes the Debtor's taxicab medallions have a value of approximately $2,000,000 — the difference between the Debtor's claimed liquidation value of $2,462,643 that affords no value to those medallions and Nady's $4,500,000 equity estimate.

> **5.      The Debtor was offered $14,000,000 for its Medallions in 2010; even if they have decreased in value by 90% they are still worth $1,400,000.**

The Debtor explored a sale of its assets in 2009.  *See, Frias Holding Co. v. Greenberg Traurig, LLP,* 2012 WL 4490855, p. 3 (Sept. 27, 2012) U.S. Dist. Ct. Dist. Nev. ("In July 2009, Creighton J. Nady, owner of A Cab, LLC ('A Cab') initiated discussions with Mr. James regarding a potential sale of A Cab…..").   When deposed in this case, Nady repeatedly, and falsely, insisted no proposed price for A Cab was ever part of those discussions.   Ex. D, Bates 784-785, Deposition p. 88-91

As confirmed by Nady at his 2015 deposition in the *Frias* case, and in the Exhibits to the same, there *was* a written draft purchase agreement for A Cab reviewed by Nady; it proposed purchasing A Cab for $15,085,000 with $14,000,000 of that price being allocated to its medallions.  Ex. C, 2015 deposition transcript, Bates 176-183,

Depo. p. 15-22 and Depo. Ex. 9 thereof Bates 326-327; Depo. Ex. 19, Bates 588-695 (Nady does not dispute accuracy of documents confirming purchase offer being made and valuing the medallions at $14,000,000 in that proposed transaction).

> **B.     The Debtor's avoidance actions, including the one involving the 800 North Bruce Street, real estate, have a reasonably presumed value that are in excess of $1,000,000.**

> **1.     The Court previously found the Debtor's avoidance action claims were valuable and of concern, rendering unworthy of acceptance the Debtor's assertion those claims should be given no value for liquidation purposes.**

When it rejected the Debtor's prior proposed Plan, the Court, relying upon, and at times quoting the Subchapter V Trustee's Report (Doc. 304), found the Debtor's avoidance actions were material and concerning. DE 123, p. 9, l. 23 – p. 13, l.1. ACAB 3149-52.   It found there were "…..exorbitant monthly payments made by debtor for several years on the Bruce property owned by one of Mr. Nady's other companies, Four Fours LLC." *Id.*, p. 12, l. 4-6.  It also found that payments possibly subject to avoidance actions as personal expenses of Nady, paid or proposed to be paid for "employee morale" and "company parties" were "exorbitant" and no explanation was offered as to "…why those so-called business expenses for business meetings, parties, and perks have increased over the years." *Id.*, p. 11, l. 2 – p. 12., l. 2.

Although neither it, nor the Trustee's Report, placed a precise value on the Debtor's avoidance claims, it found "...the Court cannot confirm a plan that does not contemplate a payout that takes into account these valuable assets in the event all allowed claims are paid in full." *Id.*, p.12, l. 23 – p. 13, l.1.   Yet the Debtor, by giving

*no value whatsoever* to those avoidance claim assets, now proposes a Plan that completely conflicts with that finding by the Court. The Debtor does so to falsely claim it is insolvent and avoid paying its creditors rightfully due post-petition "solvent-debtor" interest on their claims.

### 2. The avoidance action involving the 800 North Bruce property alone is properly valued at over $1,000,000

The Court has already ruled, consistent with the opinion of the Subchapter V Trustee as stated in his Report, that the Debtor's so-called "lease" of the 800 North Bruce property conferred no material value on the Debtor, DE 123, p. 12, l.7-15, ACAB 3151, observing that Nady has had the 800 North Bruce property "…listed for sale for many years"; that Nady's testimony the property was used for storing Debtor's vehicles was contradicted by Barlow, who testified he had never seen such vehicles there and "…the Bruce property is not zoned for such storage" and finding Barlow, not Nady's, testimony to be more credible. *Id.*

The debtor has disclosed that as of October 4, 2023, it made "rent" payments on the 800 North Bruce property of ▓▓▓▓▓ through the end of 2022 and an additional ▓▓▓▓▓ in 2023 (post-petition). Ex 42. That is a total of $▓▓▓▓▓ and the Debtor's avoidance action involving the 800 North Bruce property should be valued for at least that amount (that sum not including additional significant payments by the Debtor for real estate taxes and other expenses related to the property).

### 3.    The avoidance actions can be pursued at no risk to the Debtor's Estate by the *Murray* Creditors

The Trustee's report, weighing the probable cost of their prosecution to the estate against the likelihood they would result in a return for the creditors, concluded only the 800 North Bruce fraudulent conveyance claim potentially makes sense to prosecute. But that consideration is not controlling in this case because those claims can be pursued *at no risk whatsoever to the Estate.*

The *Murray* Creditors were prosecuting fraudulent conveyance claims against Nady and his related, non-debtor, entity Four Fours *prior* to the Petition's filing, solely at the risk and expense of the *Murray* Creditors' counsel on a contingency fee basis. The *Murray* Creditors' counsel are competent to prosecute them on behalf of the Estate and will do so on a contingency fee basis and also advance (and assume the risk of loss) of all associated expenses.   Any payment to them for doing so will be contingent upon a recovery in those claims and approval by this Court.  Because that arrangement poses no risk to the estate it would be an abuse of discretion to allow the Plan to impair the creditors while abandoning the fraudulent conveyance claims.

### C.    The Plan's liquidation analysis omits two other known assets of the Debtor having a liquidation value of over $250,000; it may understate its current cash holdings by over $470,000; and it provides no accounts receivable amount despite otherwise reporting that amount as being in excess of $540,000.

The Plan's liquidation analysis does not include the following two known, and significant, assets of the Debtor. They are entirely, and improperly, omitted from the liquidation analysis and collectively have a liquidation value of at least $250,000:

| | |
|---|---|
| **$343,387 of inventory** | This is the amount stated as of 6/30/24 in the Debtor's Form 426 Periodic Report filed per B.R. 2015.3 (Doc. 537 p. 3). The Debtor's witness previously gave testimony on its inventory, which consists of various automobile related parts, tires, and so forth, for its taxicab fleet that it services itself. Ex. S Bates 1180-87 Depo. p. 68-75. The inventory presumably has a liquidation value of 50% or 60% of this amount. The Debtor testified inventory value was omitted in error from its prior Plan's liquidation analysis and was to be corrected. *Id.* It never was and the new Plan continues to ignore its value. |
| **$89,724 in unclaimed settlement funds** | These are unclaimed settlement funds from the *Dubric* settlement identified in the Petition ("IOLTA Account of Bourassa Law") as having an "Unknown" value. Doc. 41, p. 12. The Debtor was entitled to a return of these funds almost one year ago. Ex. B, Bates 67-68 (Order adopting *Dubric* settlement agreement); Ex. A, Bates 43-45 (*Dubric* Settlement Agreement, ¶10.1 provides for reversion to the Debtor of funds remaining after settlement check payment obligation is met; ¶11.2 provides uncashed settlement checks are void 180 days after they are mailed); DE 69, (Report in *Dubric* confirming all settlement payments were distributed via mail on 5/31/22 and now, more than 180 days after such mailing, of the $224,529 in settlement fund checks only $134,805 were cashed leaving $89,724 remaining and owed to the Debtor). Nady refused to state when the Debtor would have those funds returned or why it had not already done so and claimed to not know it had the legal right to the return of those funds. Ex. D Bates 1018-1022, Depo. p. 322-325  When asked if he made any attempt to find out about that right by inquiring with his counsel (and not anything such counsel told him) he was improperly directed by his attorney to not answer the question. *Id.* |

The Debtor's Form 426 Periodic Report filed per B.R. 2015.3 (DE 83, Doc. 537 p. 3) indicates that on June 30, 2024, the Debtor possessed $543,398 in accounts

receivable and an additional amount of $134,754 in credit card receivables. Yet the Plan's liquidation analysis, dated 27 days earlier, June 4, 2024, lists no such receivables of any sort. The Debtor's prior proposed Plan also included no receivables in its liquidation analysis. When previously examined about its failure to include such receivables in its liquidation analysis, the Debtor's witness testified such receivables had some probable value and could give no reason for not including them, and giving them a value, for liquidation analysis purposes. Ex. S Bates 1202-08, Depo. p. 90-96

The Debtor's Form 426 Periodic Report filed per B.R. 2015.3 (DE 83, Doc. 537 p. 3) indicates that on June 30, 2024, the Debtor possessed $1,173,103 in cash on hand. Yet the Plan's liquidation analysis, dated 27 days earlier, June 4, 2024, only lists $700,000 in cash. This would tend to indicate the Debtor now possesses over $470,000 of additional cash curiously not included in its liquidation analysis.

> **D.** **No "equitable considerations" exist allowing the Debtor to not pay creditors post-petition interest at the Nevada judgment interest rate.**

The Ninth Circuit in *PG&E* held "We join our sibling circuits, however, in emphasizing that the solvent-debtor exception, though equitable in nature, does not give bankruptcy judges 'free-floating discretion to redistribute rights in accordance with [their] personal views of justice and fairness.' " 46 F.4th at 1064, *citing and quoting, In re Dow Corning Corp.,* 456 F.3d 668, 679 (6th Cir. 2006). As it made clear, the equitable considerations that could support a finding state law interest rates need not be paid by a solvent debtor would not exist "in most solvent-debtor cases." *Id.* It merely

wanted to "acknowledge the possibility" that such circumstances could exist in some cases. *Id.*

In this case no equitable considerations support allowing the Debtor to not pay the full measure of solvent-debtor interest owed to the *Murray* Creditors under Nevada law. Requiring such interest payments will not impair the Debtor's ability to pay any other creditors.  The Debtor has also engaged in other inequitable conduct, by refusing to attempt to reach an agreement to pay the *Murray* Creditors without filing for bankruptcy and in seeking, at great expense, confirmation of its previously rejected Plan.  Equity should not relieve the Debtor of its full responsibility to make those interest payments given its unclean hands.

### III.   The Plan has the Debtor paying at least $995,000 in income taxes it can legally avoid and does not need to pay.

#### A.   The Debtor has no income tax liability; it cannot adopt a Plan paying its owner's income tax liabilities.

The Debtor is an LLC and files no income tax return and has no income tax liability.  It is in tax parlance a "disregarded entity" reported on Nady's tax return.[7]  "A tax election to have an LLC disregarded as a taxable entity has no effect on the legal status of ownership of LLC assets." *In re KRSM Properties, LLC (Gilliam)*, 318 B.R.

---

[7] The Court denied the Objectors' motion for summary judgment (Doc. 182) on the prior proposed Plan's assumptions about the Debtor's income tax liabilities.  It did so without prejudice, allowing those issues to be raised in Objections to the prior proposed Plan and they were so raised. *See,* Doc. 381, p. 4-9.  In rejecting that proposed Plan the Court did not reach any of those issues which are now again presented.

712, 719 (BAP 9th Cir. 2004).  That separate legal status, and "disregarded entity" tax status, prohibits the Debtor from paying its owners' income tax liabilities from its bankruptcy estate.  Since the Debtor has no such tax liability its assets must first be paid to its creditors.  *Id.*, 318 B.R. 717-720.  As *Gilliam* observed:

> The owners elected to have the LLC ignored as a separately-taxed entity so that they could enjoy limited liability while avoiding double corporate and individual taxation. That choice comes with benefits and, as this appeal demonstrates, burdens.  *Id.* 318 B.R. at 720.

That *Gilliam* involved a Chapter 7 case is not germane; its analysis of how "disregarded tax entities" are treated under bankruptcy law is not disputed by any other precedent and is controlling authority.   It was also followed in the Chapter 11 case of *In re Carolina Internet, Ltd.,* 2012 WL 2860024 p. 3 (Bankr. W.D.N.Car. 2012) (S Corporation debtor pass through entity could not pay owner's income tax liabilities ahead of its creditors, those taxes were not a liability of the debtor), citing *Gilliam* and other authorities including *Mourad v. C.I.R.,* 387 F.3d 27, 29-31 (1st Cir. 2004) ("Chapter 11 bankruptcy filing does not change the tax relationship between a debtor corporation and its shareholders"; debtor pass-through tax status continued post-petition and shareholder had income tax liability for post-petition sale of debtor's assets) and other cases.

The Debtor previously, and erroneously, argued *Carolina Internet* "relied upon section 1129(b)(2)(B)(ii)" which is not applicable to Subchapter V, citing 2012 WL 2860024, at \*3.  *Carolina Internet* did not do so; it only observed, in a single sentence, the tax payment it was disallowing "would **also** contravene the Bankruptcy Code's priority scheme" provided in that section.  *Id* (emphasis added).  It rested on the

reasoning of every other case dealing with the issue:

> A significant body of case law illustrates that income taxes of a "pass through" entity, such as an S corporation or a limited liability company, are liabilities of that entity's shareholders. The filing of a bankruptcy case by the corporation does not alter its tax status or that of its shareholders. *See Pants Rack, Inc. v. U.S.,* 669 F.2d 198 (4th Cir.1982); *Mourad v. Comm'r,* 387 F.3d 27 (1st Cir.2004); *Official Comm. Of Unsecured Creditors of Forman Enters. v. Forman (In re Forman Enters.),* 281 B.R. 600 (Bankr.W.D.Pa.2002); *Hanrahan v. Walterman (In re Walterman Implement, Inc.),* 2006 Bankr. LEXIS 921 (Bankr.N.D.Iowa May 22, 2006).

> **The owners' decision to have the Debtor treated as an S corporation, enjoying limited liability while avoiding double taxation, comes with benefits and burdens.** *See, Gilliam v. Speier (In re KRSM Props.),* **318 B.R. 712 (B.A.P. 9th Cir. 2004). The Debtor's proposal would allow its shareholders to avoid those burdens at the expense of the company's creditors, without any factual or legal basis to do so.** 2012 WL 2860024, at *3 (emphasis added)

The Debtor has erroneously argued *Gilliam (In re KRSM)* and *Mourad* are inapplicable because they were Chapter 7 cases. As *Carolina Internet* illustrates, their reasoning is overwhelmingly compelling, equitable and just. A disregarded tax entity's owners must bear the burden, as well as the benefit, of their bankrupt business's elected tax treatment. It is improper to treat a Subchapter V debtor's owners differently.

The Debtor also previously argued that because a Chapter 13 business debtor may deduct taxes in determining his or her "disposable income" the Debtor may deduct the Plan's proposed tax payments in calculating its "disposable income." That is incorrect.

Chapter 13 business debtors are *always* individuals with individual income tax liabilities. They are *never* separate entities operating a business with separate owners. And Subchapter V debtors, if they are *not* a "disregarded entity," also deduct those tax liabilities to arrive at their disposable income. Chapter 13, as does Subchapter V,

authorizes deductions for "reasonably necessary" expenses of a Chapter 13 Debtor's business. 11 U.S.C. § 1325(b)(2)(B). Disregarded tax entity debtors have no income tax liabilities and it is never "necessary" for them to pay their owner's income tax liabilities. That every Chapter 13 business debtor may deduct tax liabilities (since those payments are always "necessary" for such debtors) is irrelevant here.

The Debtor has also argued that the policies underlying Subchapter V render the Plan's proposed tax payments proper, citing the ABI's *SBRA Subchapter V Guide*:

> When the generation of income by a business gives rise to taxation, it seems appropriate to determine disposable income on an after-tax basis, regardless of the tax status of the business. Moreover, in most cases the owners of the business are also its managers, and their financial difficulties arising from an inability to meet tax obligations could adversely affect the business.
>
> Courts will have to decide whether distributions to owners to pay taxes the owners incur are an appropriate expenditure that is "reasonably necessary for the continuation, preservation, or operation of the business" when the debtor is not obligated to pay the tax. *Id.* p. 50-51.

This commentary does not discuss the precedents holding bankruptcy law does not allow disregarded tax entities to pay the taxes of their owners. Nor is there reason to believe its author was aware of them. Most bankrupt disregarded tax entities are small businesses and will also have their owners filing for bankruptcy and the circumstances of *Gilliam* and this case are unusual. Because the commentary does not discuss existing bankruptcy law on the issue it provides no meaningful guidance.

The concern a Chapter V disregarded entity's successful reorganization may be threatened if it is unable to pay its owner's income taxes lacks a logical foundation. If needed to pay the tax liability from its operations, and if reorganization makes sense,

such an owner will *also* file for bankruptcy protection. Fundamental economic principles would compel an owner to do so advantageously if the business is worth saving through reorganization. The contrary result urged by Debtor (and potentially reached by the commentary upon which it relies) gives disregarded tax entity owners an unjustified windfall. They will benefit from the business's reorganization and impose their personal tax obligations on adversely impacted creditors, all while shielding their own assets from creditors. Nothing in Subchapter V supports such a highly inequitable and unfair result.

**B.     The Plan improperly diverts $995,000 or more to pay taxes the Debtor does not owe and for Nady's sole benefit; those monies should be promptly paid to creditors.**

The Debtor's Plan provides no explanation of its proposed tax liability payments, except to estimate them "@ 30.66%" for a total of $1,895,827 over the five-year Plan period. It is apparent the Plan is proposing the Debtor pay at least $995,000 of taxes that are solely a liability of Nady, not the Debtor, and by doing so delay (and possibly impair) payments to the *Murray* Creditors.

**1.     If the Debtor retains its disregarded entity status the Plan is paying $1,895,827 in income taxes not owed.**

The Plan is silent about the Debtor's income tax status. But as detailed in the Petition, the Debtor has, during the pre-Petition period, elected to be treated as a disregarded tax entity, passing all of its profits, losses, and deductions, to Nady who reports them on his personal 1040 Schedule C. DE 2, Doc. 41, p. 89. If the Debtor elects to retain that status it owes no income taxes and the entire proposed amount of

$1,895,827 of income tax payments are improper and should be made available to pay creditors during the Plan period (doing so would also shorten the necessary Plan period from its proposed five years).

### 2. If the Debtor ends its disregarded entity status the Plan is paying at least $995,000 in income taxes not owed.

The Debtor, as an LLC, need not continue to operate as a disregarded entity. It may file an IRS Form 8832 and pay income taxes as a corporation.[8] That election can be effective as of the date of its Plan's effectiveness[9] and it would pay income taxes of 21%.[10] The Plan proposes a 30.66% income tax rate to be assumed by the Debtor as a disregarded entity, adopting Nady's personal income tax rate.

The commentary relied upon by the Debtor in opposing the *Murray* Creditor's prior motion for summary judgment on the tax issue supports requiring the Debtor elect the 21% corporate tax rate. Failing to do so would have a Subchapter V debtor assume a *greater* income tax liability than necessary which "could adversely affect" its business and ability to successfully reorganize, the concerns of such commentary.

The Plan pays $1,895,827 of future income taxes based on Nady's 30.66% personal income tax rate; adopting the 21% corporate income tax rate would reduce that

---

[8] Information available at https://www.irs.gov/businesses/small-businesses-self-employed/limited-liability-company-llc

[9] This is explained in the instructions accompanying Form 8832.

[10] The corporate income tax rate was permanently lowered to 21% in 2017. *See,* https://www.congress.gov/115/plaws/publ97/PLAW-115publ97.htm

to $1,298,511 and provide $597,315 for additional prompt payment of the *Murray* Creditors' claims during the Plan Period. But that $597,315 is not the full measure of reduced tax liability the Debtor would achieve from electing corporate entity tax status. It is apparent the currently proposed Plan is exaggerating the Debtor's income tax liability (if it were to elect corporate income tax status) by over $995,000 for the benefit of Nady and to the detriment of its creditors.

The Plan provides no explanation of its handling of depreciation, including accelerated Section 179 depreciation in lieu of straight-line depreciation. Those are immaterial if the Debtor functions as a disregarded entity since it owes no income taxes from its operations. But if the Debtor is assuming (is allowed to assume)[11] income tax liabilities from those operations the tax benefits (deductions) flowing from those operations must inure to it under the Plan. They do not.

The current proposed Plan improperly saddles the Debtor, and its creditors, with unnecessary income tax liabilities arising from its operations while passing through to the ultimately responsible taxpayer, Nady, all, or most, of the tax deduction

---

[11] The *Murray* Creditors oppose allowing the Debtor to abandon its disregarded entity status and assume any income tax liabilities. Given Nady's bad faith conduct the Court should deny such permission to the Debtor and require Nady, if he wants to avoid paying the *Murray* Creditors via a liquidation of the Debtor, continue to personally assume all income tax liabilities from its operations. If the Court disagrees it can allow the Debtor's Plan to assume liability for income taxes as if the Debtor were a corporation taxed at the 21% tax rate. Nady would be free in that situation to continue the Debtor's pass-through status and assume any increased tax burden beyond that 21%.

(depreciation) benefits from those operations.  Based on the history of the Debtor's proposed Plans (this is the third), the current Plan intentionally denies at least $397,755 of additional tax deductions properly claimed by the Debtor.  It does so for Nady's benefit and at the expense of the creditors and the Court may find that proposal constitutes a lack of good faith by the Debtor.

None of the Debtor's proposed plans has provided any statement of its claimed depreciation or equipment purchase expense related tax deductions.  Every Plan projected an "Estimated tax liability @ 30.66%" with an associated amount.  But none of those tax liability amounts were actually 30.66% of the "Net Income" of the Debtor, as projected by the Plan.  All rely on an unexplained amount of deductions from "Net Income," presumably an amount of depreciation that will be claimed by the Debtor, to reconcile with that 30.66% income tax rate.

The original Plan (DE 4, Doc. 65) of 2/6/23 projected a tax liability of the Debtor of $1,661,716 over the five-year Plan period on Net Income of $6,421,880.  Doc. 65, p. 42.  That is an effective tax rate of 25.87% of Net Income and can only be reconciled with the 30.66% tax rate by deducting $1,002,193 (presumably depreciation) from Net Income.

In its Amended Plan (DE 5, Doc. 375) of 10/3/23 the Debtor revised the original tax liability projections to $1,046,695 over the five-year Plan period on Net Income of $6,421,880. Doc. 375, p. 14.  That is an effective tax rate of 16.3% of Net Income and can only be reconciled with the 30.66% tax rate by deducting $3,008,084 (presumable depreciation) from Net Income.  When filing this Amended Plan the Debtor provided

the following statement, indicating it was now claiming depreciation and equipment purchase related tax deductions in a fashion much more favorable for the Debtor (and in turn for the Debtor's creditors), to the amount of $536,000:

> Accordingly, the total potential distribution to the holders of Allowed claims in Class 4 under the Plan, as amended, shall be the revised sum of $2,310,599.54, which is an increase of $536,000.00 from the Plan as originally proposed. This amendment is due principally to the effect of electing to take accelerated depreciation (IRC § 179) on the new taxicabs the Debtor is required to purchase during the Plan to maintain operations. This Section allows for an immediate expense deduction to be taken for purchases of depreciable business equipment, and instead of capitalizing and depreciating the asset over time and where certain portions of the depreciation could fall outside the Plan's five (5) year term.  DE 5, Doc. 375, p. 2., l. 2-9.

In its subsequent Brief in support of the Doc. 375 Plan the Debtor acknowledged that "The Debtor filed this Plan Amendment to ensure that it was treating creditors fairly and equitably."  Doc. 382, p. 20, l. 13-14.  The Debtor's current Plan now disavows such "fair and equitable" treatment of creditors by abandoning the Debtor's proposed tax treatments adopted in its Doc. 375 Amended Plan.  It is rejecting the indisputable benefit to the Debtor, and the Creditors, of having the Debtor claim the available Section 179 accelerated depreciation as it previously proposed.  It projects a tax liability of $1,895,827 over the five-year Plan period on Net Income of $7,297,250.  Doc. 375, p. 14.  That is an effective tax rate of 25.98% of Net Income and can only be reconciled with the 30.66% tax rate by deducting $1,114,010 (presumable depreciation) from Net Income.

Based on the differences between the Doc. 375 amended Plan's tax treatments, and the current Plan's tax treatment, the Debtor is failing to claim at least $1,894,074 in

available depreciation expenses (presumed depreciation was $3,008,084 under the Doc. 375 Plan but only $1,114,010 under the current Plan).   Claiming that depreciation would reduce the Debtor's tax liability, if it elected the 21% corporate tax rate, by at least an additional $397,755.

**IV.     The Plan imposes an improper "Disputed Claims Reserve" on the *Murray* Creditors to continue to delay their Plan payments; that is neither fair nor equitable and the Debtor and Nady cannot be allowed to subvert state law, and the state court appeal bond process, in such a fashion.**

The *Murray* Creditors hold liquidated claims against the Debtor, consisting of Nevada state court judgments with pre-petition judgment interest, totaling $1,634,583. Only the filing of the Debtor's Petition, triggered by those judgments, prevents the *Murray* Creditors from collecting those amounts.   Yet the Debtor's Plan, despite providing what it claims is a reorganization consistent with Chapter 11, Subchapter V, does not release to the *Murray* Creditors, when they are available, any payments the Plan asserts a capacity to make.   Instead it places those funds in a "Disputed Claims Reserve" by defining the *Murray* Creditor claims as not being "Allowed Claims" but "Disputed Claims" that "…shall not be Allowed until final resolution of the Murray Appeal, and any related proceedings, by Final Order." DE 125, Doc 504, § 5.01, § 8.01.

No justification exists, and none has ever been given by the Debtor, for the Disputed Claims Reserve.   Imposing it on the *Murray* Creditors cannot, as a matter of law, be fair and equitable.   Absent the Debtor's invocation of its rights under the Bankruptcy Code, the *Murray* Creditors have an immediate right to payment, in full, of their state court judgments.   The Debtor's right under Bankruptcy Law, Chapter 11,

Subchapter V, is limited to pursuing a successful, fair and equitable, reorganization of its business. It only has the right to displace the *Murray* Creditors state law rights to the extent enforcement of those state law rights would interfere with, or obstruct, such reorganization of the Debtor, consistent with the objectives of the Federal Bankruptcy Code.

The Debtor's Plan, by definition, specifies when payments by the Debtor can be made, and in what amounts, to the *Murray* Creditors, consistent with the Debtor's successful reorganization. The Debtor has no greater rights than those — once it is able to make those payments without impairing its reorganization they must be made. When such Plan payments (which will be promptly paid under the Plan into the "Disputed Claims Reserve") are actually received by the *Murray* Creditors will have no impact on its ability to successfully reorganize. Indeed, the Debtor, by proposing the Plan, is asserting, in good faith, those payments will allow it to successfully reorganize. Any interest the Debtor has in delaying the *Murray* Creditors' *actual receipt* of those Plan payments while its second appeal of the *Murray* Creditor judgments is pending has nothing to do with its rights under the Bankruptcy Code.

"As a general rule, a chapter 11 bankruptcy filing cannot be used by a debtor to avoid the requirement of posting a supersedeas bond in a non-bankruptcy litigation to stay the effect of a judgment in that proceeding." *In re AUBSP Ownerco 8 LLC*, 2023 WL 2435689 p. 1 (Bankr. S.D. Fla. 2023), *citing In re Karum Group, Inc.*, 66 B.R. 436, 438 (Bankr. W.D. Wash. 1986); and *In re Harvey*, 101 B.R. 250, 252 (Bankr. D. Nev. 1989). Once its Plan is confirmed, and the Debtor is making Plan payments, staying the

impact of the *Murray* judgments, by delaying the *Murray* Creditors' receipt of those Plan payments pending further state court appeals, presents only issues of state law. Pursuant to Nevada law it may secure such relief by posting a *supersedeas* bond or securing a state court order it need not post such a bond. This Court, and the Bankruptcy Code, cannot impose, and does not allow the imposing of, the proposed "Disputed Claims Reserve" upon the *Murray* Creditors when it is not required (nor even alleged to be required) for the Debtor to successfully perform their proposed Plan. The Court cannot, and should not, subvert the normal state court appellate bond process by doing so.

The Disputed Claim Reserve is also unfair and inequitable by delaying the *Murray* Creditors receipt of their Plan payments for an indefinite period that could stretch for years (the *Murray* Creditors have already been waiting over six years to receive their unpaid minimum wages for which their judgments were rendered). The Plan unfairly fails to define a "final resolution" of "the Murray Appeal" and any "related proceedings" that would create an "Allowed Claims" status to the *Murray* Creditor claims. While the Plan refers to a "final order" of the "Nevada Supreme Court as to the Murray Appeal" it provides an unlimited potential extension of the *Murray* Creditors "Disputed Claims" status by *also* requiring such a "final order" occur as to any undefined "related proceedings in the Nevada State Court." DE 125, §8.01, p. 13. That open-ended language invites an endless delay in the *Murray* Creditors' right to receive Plan payments, as Nady could continue such "related proceedings" irrespective of their merit, even upon conclusion of the pending appeal.

V.    **The Plan fails to properly safeguard the rights of creditors.**

The Plan omits basic protections that should be afforded to the *Murray* Creditors to ensure it is fair and equitable.

A.    **The Plan does not unequivocally make all of the Debtor's assets, including those nominally titled to its "subseries" LLCs, available to satisfy the Plan's obligations.**

When denying confirmation of the Debtor's prior Doc. 375 Plan, the Court also ruled that: "If debtor intends to propose an amended or new plan, such plan shall also explain the relationship between the debtor parent LLC and the series, including but not limited to expanding on its assertion since the petition date that all assets of the other series LLC entities constitute property of A Cab's bankruptcy estate."   DE 123 p.13, l. 11-16.   The Debtor's new Plan does not unequivocally comply with this Order.

The Plan equivocates regarding the status of the so-called "series LLC's" that are asserted by the Debtor to be separate legal entities created by the Debtor.[12]  In its background discussion of its business operations, and its organization, the Debtor states:

> Series LLCs allow multiple businesses to find protection independently of one another. For example, if anyone files a lawsuit against any of the series LLCs or the parent LLC, this lawsuit should not affect the other businesses with it.  DE 125, §A(1), p. 1.

---

[12] The *Murray* Creditors contended in the state court that such alleged series LLCs do not actually exist.   In its decision on the Debtor's appeal, affirming the Nevada district court's judgment in majority part, the Nevada Supreme Court recognized it was disputed whether the "alleged series LLC" are "in fact, properly constituted and exist" and granted the Debtor leave to further present that issue to the district court upon remand. *A Cab LLC v. Murray,* 501 P.3d 961, 978 (Nev. Sup. Ct. 2021). The Debtor made no attempt to do so.

The foregoing is, apparently, an assertion that the *Murray* Creditors' claims against the Debtor, the "parent LLC," arising from the Nevada state court judgment against it, cannot be satisfied from assets titled to the "series LLCs" issued by the Debtor.   But the Debtor's Plan, in its discussion of the Debtor's assets, states:

> Although the Debtor, as the top level series LLC and its assets are separate and distinct from each of its series, because the **Debtor proposes its Plan herein seeking to substantively consolidate the Debtor solely for purposes of calculating distributions under the Plan**, and not for any other purpose…   DE 125, §6, p. 5-6. (emphasis provided).

The Plan then provides a summary description of various assets but includes *no statement* acknowledging (or for that matter denying) that any assets titled to the alleged series LLCs are assets of the Debtor's Estate. *Id.*   The Debtor's proposal to "substantively consolidate" the Debtor with the alleged series LLCs "solely for purposes of calculating distributions under the Plan" appears to limit such "substantive consolidation" solely for purposes of determining distributable Plan income.

If the Plan is unsuccessful in meeting its commitment to pay all creditors in full the Debtor's assets would be subject to liquidation to satisfy its creditors.  Those assets include, for purposes of these bankruptcy proceedings and pursuant to the substantive consolidation doctrine, the Debtor's alleged series LLCs and all assets to which they in turn hold title.  *See, In re The Lodge at Big Sky, LLC*, 454 B.R. 138, 142-43 (Bankr. D. Mont. 2011) (Two LLCs, one that owned hotel and other that operated it, subject to substantial consolidation, as their business functions were "hopelessly intertwined" rendering it "impossible" to treat them as "two separate entities").

It is undisputed Debtor's business functions are completely and fully intertwined with the alleged series LLCs that cannot operate without access to the Debtor's taxicab medallions. As in *Lodge at Big Sky* substantive consolidation is warranted. The Plan will not be fair and equitable unless it expressly makes all of the Debtor's assets, including those that are titled to the alleged series LLCs, part of the Debtor's Estate and subject to the Plan's obligations.

### B.    The Plan should unambiguously provide that the *Murray* Creditors alter ego claims against Nady are not an Estate Asset.

The Debtor's prior Plan asserted that the *Murray* Creditors' severed "alter ego" claims against Nady, made in the removed case, are an asset of the Debtor's estate. DE 4, Doc. 65, p. 5. The current Plan makes no such assertion. Nor does that Plan's provision for the remand of the *Murray* case "for the purpose of allowing any remaining claim adjudications or liquidation of claims to proceed" mention anything about those alter ego claims. A detailed discussion of why those claims are not assets of the Debtor's Estate (a claim the Debtor, apparently, is now abandoning) is set forth in the motion to remand.

The Plan, as a matter of fairness and equity, should unequivocally state that the severed alter-ego claims against Nady asserted in the removed action are not part of the Debtor's estate and will be remanded to the state court.

**C.**   **The Plan should include a guarantee from Nady, personally, to not transfer the 800 North Bruce Property; require consent or approval for any such transfer; and <u>only stay, not dismiss, the pending fraudulent conveyance case.</u>**

The Plan includes certain purported limitations on any potential transfer or other impairment of the 800 North Bruce property.   ECF 504, DE 125 § 7.04, p. 12.   They also provide for a dismissal of the pending (and stayed by this Court) fraudulent conveyance action commenced against Nady and Four Fours by the *Murray* Creditors. *Id.* Those terms are not fair and equitable because:

1.   As drafted, payments from any sale of such property are only prioritized to "Allowed Creditors."   The Plan currently denies "Allowed Creditor" status to the *Murray* Creditors meaning they receive no protection under those terms, as currently drafted, until they become "Allowed Creditors" — a status the Plan may deny to them for years.

2.   The Plan imposes no binding obligation by Nady, as a signatory and the controlling principle of Four Fours, to restrict the sale of the 800 North Bruce property.   As non-parties they cannot be bound by the Plan as currently drafted.   The Plan must include a specific affirmative written and signed pledge by them binding them to such restrictions.

3.   The Plan's dismissal of the fraudulent conveyance action, with a purported toll of the statute of limitations until all creditors are paid in full, grants

an illusory protection. Nady and Four Fours, and the other fraudulent conveyance case defendants, not being parties to this case, cannot be bound by any such purported statute of limitations toll.

Fairness and equity should require that Nady and Four Fours LLC be bound by Plan provisions that they either (a) Secure consent from the *Murray* Creditors to any transfer of the 800 North Bruce Property; or (b) Secure approval of such a transfer from this Court. The Plan should be so modified. In addition, the fraudulent conveyance action should continue to be stayed, not dismissed, until all creditors are paid in full.

**VI. The Plan should provide for the state court to oversee the distribution of Plan payments to the 661 *Murray* Class members.**

The Plan proposes to have Plan payments to the 661 *Murray* Class members, when made, be paid to the *Murray* Creditors' attorneys' trust fund. ECF 504, DE 125 § 10.7, p. 16. The *Murray* Creditors' attorneys are not properly charged with the expense and cost of further distributing those funds to the 661 *Murray* Class members. The state court, when it granted its final judgment in the *Murray* case, also retained continuing jurisdiction over the class members, their claims, and the *Murray* Class counsel consistent with NRCP Rule 23(b)(2). [13] DE 47, p. 33, ACAB 1574. Pursuant to that authority, the state court was charged with continuing power to oversee the distribution of funds collected for those class members and requiring A Cab to pay any necessary costs involved in distributing those funds. The Plan should provide that the

---

[13] Now NRCP Rule 23(c)(2).

state court, upon remand of the removed case, will have authority to oversee the payment of all Plan funds to the 661 *Murray* Class members and require A Cab to pay any costs associated with distributing such payments.

### VII. The Plan improperly delays payments to creditors by allowing for over $1,000,000 of unnecessary and highly unlikely expenses.

The Court, in rejecting the Debtor's prior Doc. 375 Plan, took issue with that Plan's proposed allowance of $852,000 for "employee perks" and "travel" expenses. DE 123, p. 9, l. 23 – p. 13, l.1.  ACAB 3149-52.   It found such expenses to be "exorbitant" and unjustified.  *Id.*   The Debtor's new Plan also improperly provides a combined allowance of $462,000 ($222,000 for "perks" and $240,000 for "travel") for those items. DE 125, ACAB 3194.   At least $400,000 of those expenses are unnecessary and serve to unfairly delay payments to the *Murray* Creditors.

The new Plan continues to allow for $3,000,000 in professional services expenses over its five-year period, the same as its prior denied Plan.   Based on the Debtor's history, that is over $██████ more than any reasonable allowance for those expenses, since that allowance is in majority part based upon the historic *Murray* litigation expenses.  Ex. S, Bates 1280-82 (Debtor testifies it used 2022 monthly professional expenses, including those from *Murray*, for this Plan expense projection; no allowance was made for the termination of the *Murray* case expenses once the Plan was approved).

From January 1, 2019, through December 31, 2022, the Debtor spent at least $█████████ on the *Murray* litigation.[14] That is $██████ a month for 48 months. The Debtor's Plan proposes future payments of professional services of all kinds, including for attorneys, of $50,000 a month for 60 months for a total of $3,000,000. Yet the *Murray* litigation, and its associated professional expenses, will cease upon Plan confirmation (except for the limited state court appeal). But the Plan still assumes there will be over $████████ of professional expenses incurred over the 60 month Plan period from continued *Murray* litigation. As a result, the Plan projects the Debtor incurring well over $████████ of professional expenses (*Murray* related litigation costs) it will not incur and by doing so unfairly delays payments to the *Murray* Creditors.

## CONCLUSION

For all the foregoing reasons, the Plan is unconfirmable. It is not fair and equitable. It is not proposed in good faith, does not comply with the requirements of a plan under subchapter V, it attempts to mislead the Court and creditors as to the Debtor's assets and repayment ability and it is requested that this Court enter an order

---

[14] Ex. O (S-8) indicates $1,359,247 in such expenses. Bates 1662. Ex. P (S-9) records a $50,000 payment to Jimmerson Law Firm on 10/16/2019 identified only as "retainer" and not included in Ex. O. Bates 1681. That firm represented the Debtor in its *Murray* state court appeal in 2020. Nady was improperly directed by Debtor's counsel to not provide information about that "retainer" and it should be deemed a *Murray* litigation expenditure. Ex. D, Bates 1012-1014, Depo. P. 316-318.

denying confirmation of the Plan until such time as it is modified to comport with the requirements of the Bankruptcy Code and grant such other, further and different relief as is just and proper.

Dated: September 11, 2024

Respectfully submitted,

**Law Offices of Gabriel Del Virginia**

By:  /s/ *Gabriel Del Virginia*
**Gabriel Del Virginia**
**30 Wall Street, 12th Floor**
**New York, New York 10005**
**Telephone: 212-371-5478**
**Facsimile: 212-371-0460**
**Email: gabriel.delvirginia@verizon.net**
**Leon Greenberg Professional Corporation**

By:  /s/ *Leon Greenberg*
**Leon Greenberg (NSB 8094)**
**1811 South Rainbow Boulevard, Suite 210**
**Las Vegas, Nevada 89146**
**Telephone: 702-383-6085**
**Facsimile: 702-385-1827**
**Email: leongreenberg@overtimelaw.com**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was electronically filed using the Court's CM/ECF system on this 11th day of September 2024, which will send electronic notification of this filing to all counsel of record.

/s/Ruthann Devereaux-Gonzalez
Ruthann Devereaux-Gonzalez